2021 IL App (5th) 190007-U

NO. 5-19-0007

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
Decision filed 07/20/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 16-CF-924 |
| | ) | |
| LEONDRE McCLENDON, | ) | Honorable |
| | ) | Robert B. Haida, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Presiding Justice Boie and Justice Moore concurred in the judgment.

## ORDER

¶ 1    *Held*: The trial court's use of Illinois Pattern Jury Instructions, Criminal, Nos. 11.57 and 11.58 (4th ed. 2000) was not erroneous and the jury was properly instructed regarding the offense of aggravated criminal sexual assault. The defendant's aggregate sentence of 80 years for nonhomicide offenses committed when the defendant was 16 years old is a de facto life sentence without parole in violation of the eighth amendment.

¶ 2    Following a jury trial, the defendant, Leondre McClendon, was convicted of two counts of aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(1) (West 2016)) and one count each of criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2016)), aggravated robbery (720 ILCS 5/18-1(b)(1) (West 2016)), aggravated possession of a stolen motor vehicle (625 ILCS 5/4-103.2(a)(7)(A) (West 2016)), and vehicular hijacking

1

(720 ILCS 5/18-3(a) (West 2016)). At the time of the offenses, the defendant was 16 years old. The trial court sentenced the defendant to an aggregate term of 80 years in the Illinois Department of Corrections (IDOC).

¶ 3     On appeal, the defendant contends that the trial court committed plain error and denied the defendant a fair trial because the jury was not instructed that the alleged aggravating conduct for the offense of aggravated criminal sexual assault must have existed "during the commission of the offense." In the alternative, the defendant argues that defense counsel was ineffective for failing to request such an instruction at trial. The defendant also contends that under *Graham v. Florida*, 560 U.S. 48 (2010), and *People v. Buffer*, 2019 IL 122327, his 80-year *de facto* life sentence violated the eighth amendment. For the reasons that follow, we affirm the defendant's convictions but vacate his sentence and remand this matter for a new sentencing hearing.

¶ 4                                    BACKGROUND

¶ 5     On July 29, 2016, the defendant was charged by indictment with three counts of aggravated criminal sexual assault in violation of section 11-1.30(a)(1) of the Criminal Code of 2012 (Code) (720 ILCS 5/11-1.30(a)(1) (West 2016)), vehicular hijacking in violation of section 18-3(a) of the Code (720 ILCS 5/18-3(a) (West 2016)), aggravated possession of a stolen motor vehicle in violation of section 4-103.2(a)(7)(A) of the Illinois Vehicle Code (625 ILCS 5/4-103.2(a)(7)(A) (West 2016)), and aggravated robbery in violation of section 18-1(b)(1) of the Code (720 ILCS 5/18-1(b)(1) (West 2016)). The three charges of aggravated criminal sexual assault alleged that the defendant committed three separate acts of sexual penetration. The allegations also alleged that the defendant

2

committed such acts through the use, or threatened use of force, and that the defendant used an object in a manner that led the victim to reasonably believe, under the circumstances, that the object was a dangerous weapon.

¶ 6 On August 20, 2018, the defendant's case proceeded to a jury trial. A summary of the evidence presented is as follows. On the night of May 5, 2016, the defendant, his younger brother (age 14), and the defendant's cousin (age 16) were walking down a "side street" in a residential area. As the defendant and his cohorts were walking, a car drove by them and either the defendant or his younger brother stated, "[L]ets get this car," or "something like that."

¶ 7 Meanwhile, G.A., the victim, had gotten off work between 9 p.m. and 9:30 p.m. and drove home. When she arrived at her condominium, G.A. pulled her car into the garage. She was listening to music and had talked with a friend before exiting the car. As G.A. went to close her garage door, G.A. testified that three men—the defendant, his brother, and his cousin—rushed toward G.A. The defendant stood behind G.A. and held an object[1] to her head. G.A. believed that the object was a gun and stated that the defendant repeatedly told her, "Shut up or I'll shoot." The defendant and his cohorts demanded G.A.'s phone, money, and car keys, which G.A. gave to them. While the defendant was standing behind G.A. in the garage, he put his hands down the back of G.A.'s pants. Meanwhile, the other men had difficulty starting G.A.'s car. Once the defendant's brother started the automobile, the defendant told his brother and cousin to leave, and they did so in G.A.'s car.

---

[1]Both the defendant and his cousin testified at trial that the object was a cell phone, and no gun was recovered from the defendant or the stolen vehicle.

¶ 8     The defendant then pulled G.A.'s pants down. He also pulled his pants down, and G.A. testified that the defendant began "jabbing" his penis at G.A. from behind. G.A. yelled "no," but the defendant "kept saying, shut up or I'll shoot." G.A. further testified that the defendant's penis made contact with G.A.'s anus before the defendant was able to insert his penis into her vagina. Eventually, the defendant stopped and instructed G.A. to "keep [her] head down." The defendant then walked in front of G.A. and demanded that she perform oral sex on him. G.A. testified that the defendant was still holding an object to her head at this time. The oral sex ended when the defendant pulled away, grabbed his pants, and left. G.A. admitted that she never saw a gun. Nonetheless, G.A. felt forced to perform the sexual acts because the defendant had previously threatened to shoot her, and G.A. believed that the defendant could have shot her.

¶ 9     After the defendant left G.A.'s garage, G.A. counted to 30 and then ran to her neighbor's condo to call for help. Thereafter, the police arrived and an "All Points Bulletin" (APB) was put out for G.A.'s car. Later that night, at approximately 12:57 a.m. on May 6, 2016, Detective Patrick Koebbe heard an officer report over the police radio that the stolen vehicle may have been spotted. Detective Koebbe changed his route to try and intercept the stolen vehicle. At an intersection, Detective Koebbe observed a vehicle traveling toward him without headlights. As the vehicle came through the intersection, Detective Koebbe determined that it was in fact the stolen vehicle.

¶ 10     Detective Koebbe proceeded to follow the vehicle and notified his dispatch and other officers. The driver of the stolen vehicle then increased speed and began disobeying traffic control signals. Detective Koebbe activated his emergency lights and sirens and a

4

chase ensued. Several additional officers joined the pursuit of the stolen vehicle, which reached speeds in excess of 100 miles per hour. The pursuit ended in a cul-de-sac when the stolen vehicle slowed down significantly. As the vehicle was still moving, the defendant's brother jumped out of the passenger side of the vehicle. As Detective Koebbe was stopping his car and exiting his vehicle, he observed the defendant exit the passenger side of the stolen vehicle as well. The stolen vehicle continued to travel and struck a dumpster before crashing into a concrete ravine. Detective Koebbe pursued the defendant and his brother on foot and apprehended the defendant.

¶ 11    Subsequent DNA testing confirmed that the defendant's DNA profile was found on swabs taken from G.A.'s mouth and a substance on the floor of G.A.'s garage. Also, G.A.'s DNA profile was consistent with a partial profile found on a penile swab taken from the defendant. Although no male DNA was found on the vaginal and anal swabs taken from G.A., other tests indicated the presence of semen on these swabs.

¶ 12    After the State rested its case, the defendant testified and admitted to committing the crimes of vehicular hijacking, aggravated possession of a stolen motor vehicle, and aggravated robbery. The defendant also admitted that he held his cell phone in G.A.'s face, as if it were a gun, and "snatched" her phone. The defendant claimed that he did not say anything to G.A. The defendant stated he stood behind G.A. while his brother and cousin attempted to start G.A.'s car. The defendant claimed that he then put his cell phone in his pocket because "the robbery was over with." After the defendant's brother and his cousin started the car, the defendant told G.A. to "back up," and G.A. backed up against the defendant. The defendant testified he then pushed her forward, and G.A. allegedly backed

5

into him again. The defendant testified that he grabbed G.A.'s butt and, at the time, thought G.A. was "coming on" to him. When the defendant's brother and cousin asked the defendant to leave with them, the defendant responded that he would "catch up later."

¶ 13    After his brother and cousin left, the defendant pulled down G.A.'s pants and then his own. The defendant testified that he had sex with G.A. and received oral sex. The defendant denied that his penis ever touched G.A.'s anus. The defendant also claimed that he never held a cell phone to G.A.'s head or threatened her during the sex acts. The defendant testified that at the time of the offenses, he believed G.A. was consenting to the sex acts. The defendant further testified that, at the time of trial, the defendant no longer believed G.A. was consenting. The defendant presented no other evidence.

¶ 14    Following the parties' closing arguments, the trial court instructed the jury pursuant to the agreed upon jury instructions, which included a definitional and issues instruction for aggravated criminal sexual assault using Illinois Pattern Jury Instructions, Criminal, Nos. 11.57 and 11.58 (4th ed. 2000) (hereinafter IPI Criminal 4th). After deliberations, the jury found the defendant guilty of vehicular hijacking, aggravated possession of a stolen motor vehicle, aggravated robbery, two counts of aggravated criminal sexual assault regarding the allegations of vaginal penetration and anal contact, and criminal sexual assault for the allegation of oral penetration.

¶ 15    Prior to the defendant's sentencing, a PSI was prepared. The PSI indicated that the defendant last attended school in the tenth grade. The defendant reported that he was an occasional user of alcohol and used cannabis every other day. The defendant stated that he had never been evaluated or treated for substance abuse. Information obtained from the jail

6

revealed that the defendant was not prescribed any medication. The PSI also detailed the defendant's history of criminality and juvenile delinquency. The defendant's criminal history included four felony charges for aggravated battery, which were pending at the time of the PSI. The defendant's history of delinquency included adjudications for aggravated battery, possession of a stolen vehicle, aggravated robbery, burglary, damage to property, aggravated assault, criminal damage to government property, and resisting a peace officer.

¶ 16    On September 24, 2018, the defendant filed a posttrial motion. At the sentencing hearing held on October 4, 2018, the trial court denied the defendant's posttrial motion. On the day of sentencing, the defendant also filed a "Memorandum of Law Regarding Permissible Sentence Range." In the defendant's memorandum, he argued, *inter alia*, that the defendant could not be sentenced to a term of years that amounts to life without parole. The defendant also cited to the First District's decision in *People v. Buffer*, 2017 IL App (1st) 142931, which held that a sentence of 50 years imposed on a 16-year-old juvenile offender was a *de facto* life sentence. At the time of the defendant's sentencing, the *Buffer* case was pending before the Illinois Supreme Court.

¶ 17    As evidence in aggravation, the State presented the testimony of Tara Arthur-Bergman, the defendant's juvenile probation officer. Arthur-Bergman testified that she had referred the defendant to the Mental Health Juvenile Justice Program through Chestnut Health Systems while the defendant was on juvenile probation. Chestnut unsuccessfully attempted to make contact with the defendant's mother, and the defendant was never assessed for the program. Arthur-Bergman also testified that the defendant was charged with aggravated battery for hitting an individual with a lunch tray while in the juvenile

7

detention center. When the defendant was released from detention, he was placed on electronic monitoring and incurred numerous violations. At the time of the offenses in the present case, the defendant was on electronic monitoring. Following Arthur-Bergman's testimony, the parties stipulated to the admission of 14 reports from the juvenile detention facility regarding incidents related to the defendant's conduct while in detention.

¶ 18    Next, Rodney Wilson, a corrections officer at the St. Clair County jail, testified that the defendant was involved in a fight while incarcerated. In the fight, the defendant struck, kicked, and stomped on another inmate, causing the other inmate to suffer fractured vertebrae. Finally, G.A. read her victim impact statement.

¶ 19    Defense counsel asked the trial court to take notice of the defendant's evaluations regarding his mental status conducted prior to trial.[2] Dr. Cuneo's reports indicated that Dr. Cuneo diagnosed the defendant with: (1) adjustment disorder with depressed mood; (2) attention deficit hyperactivity disorder (ADHD), combined presentation; (3) cannabis use disorder, moderate, in a controlled environment; (4) conduct disorder; (5) borderline intellectual functioning; and (6) "Rule Out Mild Intellectual Disability." Dr. Cuneo reported that, intellectually, the defendant was functioning in the "Mild Mentally Retarded

---

[2]Pursuant to the defendant's request, the defendant had been evaluated by Dr. Daniel Cuneo on three separate occasions related to the defendant's sanity at the time of the alleged offenses and the defendant's fitness to stand trial. After his first, evaluation, Dr. Cuneo concluded that the defendant was legally sane at the time of the alleged offenses but believed that the defendant qualified for a "plea of guilty but mentally ill." Following his second evaluation, Dr. Cuneo opined that the defendant was fit to stand trial. The trial court held a fitness hearing and found the defendant fit to stand trial. The defendant subsequently entered a "plea of guilty but mentally ill" to all of the charges pending against him. The defendant was sentenced to an aggregate prison term of 70 years in IDOC, but the trial court allowed the defendant to later withdraw his guilty plea. Dr. Cuneo again evaluated the defendant and concluded that he was fit to stand trial. After another fitness hearing, the trial court again, found the defendant fit to stand trial.

8

Range of Intelligence" and had an IQ of 68. Dr. Cuneo stated that the defendant's cognitive abilities were that of an 11-year-old and indicated that the defendant had been in special education programming while in school for behavior difficulties. Dr. Cuneo reported that the defendant also had an "extremely short attention span, was "extremely impulsive," and had a very low frustration tolerance level. Dr. Cuneo further reported that under minimal stress, the defendant would "quickly decompensate into anger and lash out." Defense counsel also asked the trial court to consider a "redeploy evaluation" in the defendant's juvenile files. Additionally, defense counsel noted that the defendant's juvenile court files contained an evaluation from 2015 which indicated that the defendant had a composite IQ of 73 and was considered "borderline mentally retarded."

¶ 20    The State asked the trial court to sentence the defendant to an aggregate prison term of 75 years in IDOC. The State acknowledged the defendant's youth at the time of the offense but argued that several aggravating factors applied to the defendant's case. The State also discussed the mitigating factors for sentencing a juvenile. See 730 ILCS 5/5-4.5-105 (West 2018). Defense counsel argued that *Graham* applied to the defendant's case and that the defendant must be parole eligible before the age of 64. Defense counsel also discussed the juvenile sentencing factors and requested a "much lower sentence." Defense counsel submitted that the minimum term was 16 years. The defendant did not make a statement in allocution.

¶ 21    The trial court indicated that it had considered the evidence presented by the State and the defendant. The trial court found no statutory factors in mitigation but did consider the psychological reports as mitigation "to some extent." The trial court found that several

9

aggravating factors applied to the defendant's case and determined that consecutive sentences were necessary to protect the public. The trial court also considered the juvenile sentencing factors. Finally, the trial court sentenced the defendant to 30 years for each aggravated criminal sexual assault conviction and 5 years for each conviction of criminal sexual assault, vehicular hijacking, aggravated unlawful possession of a stolen motor vehicle, and aggravated robbery. The trial court ordered that all of the sentences were to run consecutive to each other for an aggregate prison term of 80 years. The trial court stated that according to its calculations, the defendant would be eligible for parole "sometime in the distant future."

¶ 22    On October 26, 2018, the defendant field a motion to reconsider sentence arguing, *inter alia*, that the defendant's sentence violated the eighth and fourteenth amendments of the United States Constitution (U.S. Const., amends. VIII, XIV), as well as the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). The trial court denied the defendant's motion. This appeal follows.

¶ 23                                ANALYSIS

¶ 24    The defendant first contends that the trial court erred when instructing the jury regarding the offenses of aggravated criminal sexual assault. The defendant claims that he was denied a fair trial because the jury instructions did not instruct the jury that the alleged aggravating conduct—the use or threatened use of an object—must have occurred "during the commission of" a criminal sexual assault offense. At trial, the defendant requested no such instruction.

10

¶ 25    Generally, "[n]o party may raise on appeal the failure to give an instruction unless the party shall have tendered it." Ill. S. Ct. R. 366(b)(2)(i) (eff. Feb. 1, 1994). Nevertheless, substantial defects in jury instructions are not waived by a defendant's failure to make a timely objection if the interests of justice require. Ill. S. Ct. R. 451(c) (eff. Apr. 8, 2013). The purpose of Rule 451(c) is to allow for the correction of grave errors and errors in cases so factually close that fundamental fairness requires that the jury be properly instructed. *People v. Sargent*, 239 Ill. 2d 166, 189 (2010). Rule 451(c) is coextensive with the plain error doctrine found in Illinois Supreme Court Rule 615(a). *Sargent*, 239 Ill. 2d at 189.

¶ 26    The plain error doctrine allows a reviewing court to consider unpreserved error when:

> "(1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurs and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Sargent*, 239 Ill. 2d at 189.

In both instances, the burden of persuasion lies with the defendant. *People v. Herron*, 215 Ill. 2d 167, 187 (2005). The first step in plain error analysis is to determine whether error occurred at all. *Sargent*, 239 Ill. 2d at 189.

¶ 27    "The purpose of jury instructions is to provide the jury with the correct legal principles applicable to the evidence, so that the jury may reach a correct conclusion according to the law and the evidence." *People v. Bannister*, 232 Ill. 2d 52, 81 (2008). The

11

Illinois Pattern Jury Instructions (IPI) must be used if the instructions contain an applicable instruction on a subject which the trial court determines the jury should be instructed, unless the court determines that the instruction does not accurately state the law. *Bannister*, 232 Ill. 2d at 81. The IPI have been "painstakingly drafted" to clearly and concisely state the law, and trial courts should not take it upon themselves to second-guess the drafting committee where the instruction in question clearly applies. *People v. Durr*, 215 Ill. 2d 283, 301 (2005). The decision to give a certain jury instruction rests in the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *People v. Lovejoy*, 235 Ill. 2d 97, 150 (2009). An abuse of discretion occurs if the jury instructions given are unclear, mislead the jury, or are not justified by the evidence and the law. *Lovejoy*, 235 Ill. 2d at 150. Whether the jury was properly instructed, however, presents a question of law which we review *de novo*. *People v. Thompson*, 2017 IL App (5th) 120079-B, ¶ 21.

¶ 28    Here, the defendant was charged with three counts of aggravated criminal sexual assault in violation of section 11-1.30(a)(1) of the Code (720 ILCS 5/11-1.30(a)(1) (West 2016)). Section 11-1.30(a)(1) provides that a person commits aggravated criminal sexual assault if that person commits the offense of criminal sexual assault, and during the commission of the offense, "the person displays, threatens to use, or uses a dangerous weapon, other than a firearm, or any other object fashioned or used in a manner that leads the victim, under the circumstances, reasonably to believe that the object is a dangerous weapon." 720 ILCS 5/11-1.30(a)(1) (West 2016). At trial, the trial court instructed the jury, without objection, in accordance with IPI Criminal 4th Nos. 11.57 and 11.58. The jury was instructed that "[a] person commits the offense of aggravated criminal sexual assault when

he commits criminal sexual assault and threatens to use or uses any object fashioned or utilized in such a manner as to lead the victim under the circumstances reasonably to believe it to be a dangerous weapon." See IPI Criminal 4th No. 11.57. The jury was further instructed that to sustain the charge of aggravated criminal sexual assault, the State was required to prove: (1) "[t]hat the defendant knowingly committed an act of sexual penetration upon G.A."; (2) "[t]hat the act was committed by the use of force or threat of force, and that G.A. did not consent to the act of sexual penetration"; and (3) "[t]hat the defendant threatened to use or used any object fashioned or utilized in such a manner as to lead the victim under the circumstances reasonably to believe it to be a dangerous weapon." See IPI Criminal 4th No. 11.58.

¶ 29    We do not find that the trial court's use of these pattern jury instructions was erroneous. These instructions clearly and concisely stated the law and instructed the jury as to each proposition the jury was required to find in convicting the defendant of aggravated criminal sexual assault. The defendant cites no case law or authority holding that the trial court either abused its discretion or erred by failing to include the phrase "during the commission of the offense" in the challenged instructions. Finding no error in the jury instructions given, we need not continue with plain error analysis or consider the defendant's contention that trial counsel was ineffective for failing to request a non-IPI instruction.

¶ 30    Next, the defendant argues that his sentence is unconstitutional under *Graham* and *Buffer* because he received a *de facto* life sentence for nonhomicide offenses committed when he was 16 years old. In *Graham*, the United States Supreme Court held that the eighth

13

amendment prohibits a sentence of life without parole for a juvenile offender convicted of a nonhomicide offense. *Graham*, 560 U.S. at 74. The *Graham* Court observed that a sentence of life without parole is " 'the second most severe penalty permitted by law.' " *Graham*, 560 U.S. at 69 (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy J., concurring)). The *Graham* Court explained that a life without parole sentence "alters the offender's life by a forfeiture that is irrevocable," depriving the offender "of the most basic liberties without giving hope of restoration, except perhaps by executive clemency—the remote possibility of which does not mitigate the harshness of the sentence." *Graham*, 560 U.S. at 69-70.

¶ 31　While the *Graham* Court found that the eighth amendment prohibited a life without parole sentence for juvenile offenders convicted of nonhomicide offenses, the Court stated that a State is not required to guarantee eventual freedom to such juvenile offenders. *Graham*, 560 U.S. at 75. Rather, the States must give these juvenile offenders "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham*, 560 U.S. at 75.

¶ 32　More recently, our supreme court determined that, for eighth amendment purposes, a sentence of more than 40 years for a juvenile offender is a *de facto* life sentence. *Buffer*, 2019 IL 122327, ¶¶ 40-41. The *Buffer* court found that a sentence of 40 years or less imposed on a juvenile offender provides some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. *Buffer*, 2019 IL 122327, ¶ 41.

¶ 33　The State concedes that the defendant received a *de facto* life sentence, and as imposed, the sentence does not provide for the possibility of parole. We accept the State's

14

concession on this point and find that the defendant's aggregate sentence of 80 years for nonhomicide offenses committed when he was 16 years old is a *de facto* life sentence prohibited by the eighth amendment. Consequently, the defendant must be resentenced in accordance with *Graham* and *Buffer*.

¶ 34   For the foregoing reasons, we affirm the defendant's convictions but vacate his sentence and remand this case for a new sentencing hearing.

¶ 35   Affirmed in part; vacated and remanded in part.